## IN THE COURT OF APPEALS OF IOWA

No. 18-0044
Filed April 18, 2018

**IN THE INTEREST OF C.D., K.S., and C.P.,**
**Minor Children,**

**T.S., Mother,**
 Appellant.

_____

Appeal from the Iowa District Court for Polk County, Louise M. Jacobs, District Associate Judge.

A mother appeals the termination of her parental relationship with three children. **AFFIRMED.**

Lisa M. Noble of Lisa Noble Law Office Inc., Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee State.

Erin E. Mayfield of Youth Law Center, Des Moines, guardian ad litem for minor children.

Considered by Doyle, P.J., and Tabor and McDonald, JJ.

**TABOR, Judge.**

A mother, Tina, contests the juvenile court order terminating her parental relationship with three children: K.S. born in 2010, C.D. born in 2012, and C.P. born in 2015.[1] Her petition on appeal first alleges the State did not offer clear and convincing evidence to meet the statutory grounds for termination. But Tina concentrates on her desire for an additional six months to reunify with her children. She also argues termination is not in the children's best interests. Finally, Tina contends the Iowa Department of Human Services (DHS) did not make reasonable efforts to return the children to her care.

After a close examination of the record, our conclusion mirrors that of the juvenile court.[2] Despite making some progress in managing her mental health, Tina's parenting abilities are still not strong enough to ensure a safe return home for the three children. At the time of the termination hearing, the children had been out of the home for more than fourteen months with no move toward unsupervised visitation. And Tina had been receiving services through the DHS for at least seventeen months. We decline to further postpone permanency for the three children under these circumstances.

---

[1] The juvenile court also terminated the parental rights of the three fathers. They are not parties to this appeal.

[2] We review termination-of-parental-rights proceedings de novo, which means examining both the facts and law and adjudicating anew those issues properly preserved and presented. *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995). Although we are not bound by the juvenile court's factual findings, we give them weight, especially when witness credibility is key to the outcome. *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). The State must offer clear and convincing proof, which means we see no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (quoting *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000)).

## I.  Facts and Prior Proceedings

A medical condition suffered by Tina's middle child, C.D., prompted the DHS to intervene with this family.  Doctors diagnosed C.D. with bilateral club foot, a birth abnormality where the infant's foot is twisted out of position.  In October 2015, C.D. travelled to University Hospitals and Clinics in Iowa City for corrective surgery known as tibialis anterior tendon transfer.  After wearing a cast for six weeks, C.D. required physical therapy to teach him to walk again because his foot was in a new position.  Tina did not comply with the follow-up physical therapy— missing four scheduled appointments and imperiling the success of the surgery and the child's ability to walk normally.  Child Protective Services received reports three-year-old C.D. regressed to crawling rather than walking during this time.  In April 2016, a child-abuse assessment found a denial of critical care; although Tina blamed the lack of follow-up on travel challenges, the DHS asserted transportation assistance was offered but declined by the parents.  The State filed a petition asking that C.D. be adjudicated as a child in need of assistance (CINA).  After the DHS intervened, C.D. received the physical therapy he needed.

In May 2016, the State filed petitions asking the court to likewise adjudicate K.S. and C.P. as CINA.  The petitions alleged Tina was doing "a poor job of supervising" the children and the children were physically aggressive toward each other.  In August 2016 C.P.'s father, Nathan, assaulted Tina, which contributed to a breakdown in her mental health requiring hospitalization.[3]  The children were

---

[3] The district court issued a criminal no-contact order, and Nathan later pleaded guilty to domestic abuse assault.

removed from Tina's custody, and each placed in a different home. The juvenile court adjudicated the children as CINA in September 2016.

Despite the no-contact order, the record shows Tina maintained a relationship with Nathan until February 2017. And even after Tina severed ties with Nathan, she failed to achieve enough independence to reassure the DHS workers. According to the DHS caseworker's testimony, Tina did not establish a home of her own, but instead she moved into the house of acquaintances and developed an "unhealthy" level of "codependency" with her new male roommate. The DHS disapproved of the roommate attending visitations because he would "interject" for Tina and "he would tell her what she should and shouldn't do with regards to what the Department was requesting from her."

The caseworker also had continuing concerns about Tina's mental health. Tina received disability benefits based on her diagnoses of depression, anxiety, Tourette syndrome, attention deficit/hyperactivity disorder, and post-traumatic stress disorder. Yet during the pendency of the CINA case, Tina was sporadic in her participation in therapy sessions and was inconsistent with medication management. Tina did make some strides late in the game, as an October 2017 therapy progress report indicated, Tina was becoming "more transparent about her past domestic violence history and is currently processing how this has affected herself and her children." The therapist recommended continued ongoing therapy and medication management.

At the time of the termination hearing, Tina had two ninety-minute interactions with the children each week. The family safety, risk, and permanency (FSRP) worker described Tina as caring and positive during the visits. But the

FSRP worker also reported Tina had difficulty handling the needs of all three children at once; Tina continued to need "redirection" from the worker to engage in safe and appropriate discipline with the children during the supervised visitations. When the FSRP worker tried to offer a third visit per week, the children started acting out—crying, pulling one another's hair, and throwing things. The DHS caseworker was not confident Tina, on her own, could protect her children from physical harms, expressing her professional opinion: "[i]f Tina didn't have professionals around and if she was taking the children out in public" she "couldn't make sure one doesn't run in front of a car."

In November 2017, the juvenile court held a hearing on the State's petition to terminate parental rights. Tina testified she was benefitting from therapy addressing domestic-violence and codependency issues, but "[t]he healing process is going to take a very, very long time." Tina told the court: "I know I'm capable of raising my kids." But she candidly added: "I know I'm not capable right now at this second, but six months from now, you know, I'm trying to get on FUP [Family Unification Program Section 8 public housing]." After the trial, Tina's counsel submitted a "closing argument in support of granting a six month extension for reunification." In December 2017, the juvenile court issued an order terminating Tina's relationship with the children, citing Iowa Code section 232.116(1)(f), (h), and (k) (2017). Tina challenges that order on appeal.

## II. Analysis of Tina's Claims

### A. Statutory Grounds

When the juvenile court terminates parental rights on more than one statutory basis, we may affirm the order on any ground supported by clear and

convincing evidence. *D.W.*, 791 N.W .2d at 707. In this case, we find clear and convincing evidence to support termination under section 232.116(1)(f)[4] for C.D. and K.S., the two older children, and section 232.116(1)(h)[5] for C.P., the youngest child. The age parameters, CINA adjudication,[6] and removal timelines are met for both provisions. The only debatable point is whether the State offered clear and convincing evidence the children could not be returned to Tina's care at the present time. *See D.W.*, 791 N.W.2d at 707 (interpreting "present time" to mean the date of the termination hearing).

At the termination hearing, Tina conceded she needed more time to develop the capacity to raise her children; she was on a waiting list for subsidized housing and just starting to grapple with the trauma of surviving domestic violence.

---

[4] The State must prove these four elements:

    (1) The child is four years of age or older.
    (2) The child has been adjudicated [CINA under] section 232.96.
    (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
    (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Iowa Code § 232.116(1)(f).

[5] The State must prove these four elements:

    (1) The child is three years of age or younger.
    (2) The child has been adjudicated [CINA under] section 232.96.
    (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
    (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Iowa Code § 232.116(1)(h).

[6] To the extent Tina's first issue challenges the sufficiency of the evidence for the CINA adjudication, that issue is now moot. *See In re Y.G.*, No. 16-1075, 2016 WL 5408002, at *1 n.2 (Iowa Ct. App. Sept. 28, 2016) (noting no appeal was filed in the underlying CINA case).

Termination was proper under paragraphs (f) and (h). *See In re J.E.*, 723 N.W.2d 793, 799 (Iowa 2006) (finding child could not be safely returned home because mother had not sufficiency benefited from services).

B.      **Additional Time**

At the termination hearing, Tina more realistically pinned her hopes on the juvenile court granting her an additional six months to prepare for the children's return. A placement extension requires a court to determine there will no longer be a reason for removal in six months. *See* Iowa Code § 232.104(2)(b). Like the juvenile court, we doubt if another six months of services would enable Tina to overcome the mental-health instability and codependency that has undermined her ability to be a suitable parent. She had been receiving services since April 2016 and still had not been able to pull together the parenting skills necessary to protect the children from harm. Tina's housing remained unstable, and her therapy progress notes indicated she has just begun to appreciate the damaging trauma that domestic violence had caused her and her children. While Tina may be on the right road, the remaining journey appears too long to justify keeping the children in a state of flux. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (noting termination should not be delayed in the hopes that a parent may someday become a suitable caregiver).

C.      **Best Interests**

Tina next contends termination was not in the children's best interests under section 232.116(2). That provision focuses on the children's safety, as well as the best placement for furthering their long-term nurturing and growth, and their physical, mental, and emotional condition and needs. *See In re P.L.*, 778 N.W.2d

33, 40 (Iowa 2010). In applying the statutory best-interests standard we cannot rule in a way that would deprive children of permanency by hoping someday their parent will be able to offer proper care and a stable home. *Id.* at 41. Tina deserves credit for important changes she has started to embrace to improve her mental health and address the impact of domestic violence on her children. But we must envision the children's long-range best interests based on a parent's track record. *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012). Tina's past performance does not instill confidence. As the juvenile court concluded, Tina has not prioritized the needs of her children. The children's best interests are served by ensuring they have caregivers who can keep them safe and nurture their growth and development into the future. Unfortunately, Tina has not proven to be such a caregiver. Her best-interests argument is not persuasive.

### D.     Reasonable Efforts

Tina accuses the DHS of shirking its responsibility to make reasonable efforts to reunify her with the children. When considering the reunification efforts advanced by the DHS, she identifies five deficiencies: (1) "subjecting" the children to visitation with Nathan, who committed domestic violence against their mother; (2) no visitation among the siblings who were placed in three different homes; (3) denials of increased visitation for Tina; (4) failure to connect her with a "parent partner" to provide support and guidance during the CINA case; and (5) failure to offer transportation assistance.

The DHS is required to exert every reasonable effort to return children to their home—consistent with their best interests. Iowa Code § 232.102(6)(b). "Reasonable efforts" include services offered to eliminate the need for removal or

to make it possible for the children to safely return to the family home. *Id.* The duty to make reasonable efforts is not "a strict substantive requirement of termination," but the extent of the measures taken by the DHS "impacts the burden of proving those elements of termination which require reunification efforts." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000). While the reasonable-efforts burden rests with DHS, parents also shoulder a responsibility to object if they believe the nature or extent of services is inadequate. *In re L.M.,* 904 N.W.2d 835, 839-40 (Iowa 2017) (emphasizing a parent's objection should be made as early as possible in the process so the juvenile court can order appropriate changes).

We start with Tina's claim that the DHS should not have arranged for her to share visitation time her abuser. At the termination hearing, the mother's attorney cross-examined the DHS case worker concerning the joint visitation.

> Q. In your training on domestic violence, do you believe that it's appropriate to have a victim of abuse in the same room at the same time with the perpetrator? A. Through our training, the Safe and Together model[7] focuses on keeping the people together. So while we focus on Tina and helping her become a protective parent and increasing her protective capacities, we also work with Nathan on addressing his domestic violence tendencies through separate services while keeping the family together.

The county attorney objected to this line of questioning because no reasonable-efforts argument had been raised until the termination hearing. The juvenile court allowed the examination but cautioned, "I will take into consideration

---

[7] In 2016, through DHS funding, Iowa State University partnered with David Mandel and Associations, a child-welfare consulting group, to introduce the "Safe and Together" program to Iowa social workers. According to ISU, "the model contains three principles: keeping the child safe and together with the non-offending parent, partnering with the non-offending parent, and intervening with the perpetrator to reduce risk and harm to the child." News Release, Iowa State University, Iowa State University shifts focus to children in domestic violence cases (July 25, 2016) www.hs.iastate.edu/news/2016/07/25/child-welfare/.

this is not the time to raise reasonable efforts for something that occurred prior to any order since then." The caseworker testified unless a safety issue existed, the DHS did not "typically force parents" to hold visits separately, and Tina and Nathan requested their visits be together. In a written "closing argument" filed post-trial, the mother's attorney vigorously argued the DHS "failed to keep [Tina] safe" by "subjecting" her to "co-parenting" with Nathan who threatened and attacked her. The juvenile court did not expressly address the joint-visitation issue but ruled the DHS "did make reasonable efforts" to reunify Tina with her children.

On appeal, Tina's counsel does not fully form an argument as to why the joint visits impeded reasonable efforts. Nor does counsel contend Tina objected to the joint visitations when they were occurring. We do see some irony in the DHS's criticism of Tina for requesting the children be placed with Nathan when she was hospitalized after the domestic-abuse assault, while defending its own decision to sponsor joint visitation between the victim and the batterer. Yet given the scanty record and undeveloped argument on this issue, we cannot conclude the joint visitations detracted from the DHS's reasonable efforts at reunification.

We next turn to the issue of sibling separation and visitation. Our courts have recognized a preference for keeping brothers and sisters together whenever possible. *In re T.J.O.*, 527 N.W.2d 417, 420 (Iowa Ct. App. 1994). The legislature also has directed the DHS to make reasonable efforts to keep siblings together in the same placement, and if that is not possible, "to provide for frequent visitation and ongoing interaction" between siblings who are not in the same placement. Iowa Code § 232.108(2).

Since removal, the DHS has maintained K.S., C.D., and C.P. in separate homes. The DHS placed K.S. with her maternal step-grandfather, C.P. with his paternal step-grandmother and then in a pre-adoptive foster home, and C.D. with a different foster family. C.D. continued to have medical and physical-therapy needs that required special training and a substantial time commitment by his foster parents. On appeal, Tina lodges a terse objection that DHS "did not provide for visitation between siblings." Her claim is not entirely accurate. The record shows the children did interact with each other when attending visitations with their mother. But the record does not reflect whether the children's caregivers arranged for separate visits among the siblings or planned to do so after the termination of parental rights.[8]

On appeal, the mother has not explained how sibling visitation would have helped eliminate the need for removal of the children or made it possible for the children to safely return home. *See id.* § 232.102(6)(b). Furthermore, it does not appear Tina raised her concern about sibling visitation in the juvenile court. Accordingly, we consider it waived. *See In re I.M.*, No. 13-0821, 2014 WL 4225169, at *2 (Iowa Ct. App. Aug. 27, 2014) (citing *Meier v. Senecaut,* 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.")).

---

[8] Although the juvenile court appointed the same guardian ad litem (GAL) to represent all three children, our record contains no reports filed by the GAL to help us understand the impact of separation on the three siblings. The juvenile court stated in its order that the GAL favored termination, but the GAL did not make a statement to that effect at the trial.

Tina also claims the DHS fell short of reasonable efforts by denying her expanded visitation with the three children. In considering the reasonableness of the nature and extent of visitation offered by the DHS, the best interests of the children are controlling. *See In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996). Tina had two supervised visitations per week with the three children starting in the fall of 2016. In July 2017, she filed a motion asking for increased visitation as a reasonable effort to facilitate reunification. In August 2017, the juvenile court filed a permanency order—concluding Tina needed help with transportation and directing the State to file a termination petition.

On appeal, Tina contends the DHS did not provide transportation for visits as ordered by the juvenile court. This claim is not supported by the record. The workers described their efforts to transport all three children for visits. And although the permanency order did not address visitation, the DHS added a third visit per week in the fall of 2017. The change did not go well. The caseworker explained: "Because they were taking approximately an hour to transport one way for all three children, the children would scream and cry, hit each other, pull each other's hair." The DHS returned to twice-per-week visits but increased the time Tina could spend with the children during those two sessions. The children's behavior improved according to the caseworker. Because the extent of visitation with Tina matched the best interests of the children, we find the DHS satisfied its reasonable-efforts requirement on this front. *See id.* (concluding visitation arrangement did not cause the DHS "to fall short of its obligation to provide reasonable efforts to reunite parent and child").

Finally, we tackle Tina's complaint that she did not have the benefit of a "parent partner" to help shepherd her though the child-welfare process.[9] Parent partners "have experienced the system and reunified with their children" before they are recruited to guide and support other parents involved in the child welfare system. Diane Boyd Rauber, *From the Courthouse to the Statehouse: Parents As Partners in Child Welfare*, 28 Child L. Prac. 145, 149 (2009). "When a well-trained parent partner is involved, the respondent parent can complete the case plan requirements more quickly and the parent's attorney can argue for reunification more effectively." *Id.*

Tina raised this issue in the juvenile court. She testified she asked for a parent partner and was told she first needed to "work on [her] mental health needs." Tina continued: "Since I didn't start working on my mental health needs until I was capable, until I was out of denial and able to work on it, that's why I didn't ask for a parent partner up until about seven months ago." When she renewed her request for a parent partner, she asserts "nobody got back with [her] on that." In her written closing arguments, Tina's attorney asked:

> Is it likely that a parent partner would have made it possible for Mother to reunify with her children and have them placed in her care prior to the TPR Petition? That question cannot be answered by anyone, as DHS failed to offer a parent partner, and did not acknowledge their lack of reasonable efforts to the Court.

The juvenile court addressed this issue in its termination ruling:

---

[9] The Iowa DHS started its Parent Partners program in 2007 in four pilot sites and by 2015 had implemented the service in all 99 counties. According to the DHS website, "Parent Partners meet with social workers, counselors, attorneys, and others regularly to assess progress, and are able to help professionals empathetically and productively interpret the patterns, behaviors, and needs of families." Parent Partners, Iowa Department of Human Services, www.dhs.iowa.gov/parent-partners (last visited April 4, 2018).

Tina argues that she did not have a parent partner as she requested and that she could have been successful if only she had a parent partner (see filed closing argument). While it is true that she requested a parent partner, one is not always available and one was not provided for her. It is not likely that such would have caused a different result than that which is present today since Tina, even in her written argument, concedes by stating the question [whether a parent partner would have made it possible for her to reunify with the children] cannot be answered by anyone.

On appeal, Tina asserts parent partners are "crucial" to a family's success "as they provide support, clarification, and guidance to a parent involved in a CINA matter." We agree parent partners can be a great resource in juvenile court. But "what constitutes reasonable services varies based upon the requirements of each individual case." *In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002). "Generally, in making reasonable efforts to provide services, the State's focus is on services to improve parenting." *Id.* And as other jurisdictions have concluded, the reasonable-efforts requirement doesn't mean the DHS must marshal every imaginable resource. *See In re R.P.*, ___ N.E.3d ___, ___, 2018 WL 798409, at *11 (Ohio Ct. App. 2018) ("Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible."); *see also In re Savannah Y.*, 158 A.3d 864, 872 (Conn. App. Ct. 2017) ("[R]easonable efforts means doing everything reasonable, not everything possible." (alteration in original)).

Our court did determine the refusal to provide an American Sign Language interpreter for a deaf mother amounted to a violation of the reasonable-efforts requirement when the mother's advocate testified the communication assistance would have "made a significant difference in her ability to make progress." *In re J.L.*, 868 N.W.2d 462, 467 (Iowa Ct. App. 2015) (outlining the DHS

nondiscrimination policy).  But the instant facts do not present the same deprivation.  When we look at the totality of services offered Tina by the DHS over the seventeen months of the CINA case, we cannot find the absence of a parent partner to be a violation of the reasonable-efforts requirement.

**AFFIRMED.**