**IN THE COURT OF APPEALS OF IOWA**

No. 15-0539
Filed June 10, 2015

**IN THE INTEREST OF J.L.,**
**Minor Child,**

**V.L., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Floyd County, Karen K. Salic, District Associate Judge.

A mother appeals the termination of her parental rights to her child, born in 2014. **REVERSED AND REMANDED.**

David A. Kuehner of Eggert, Erb, Mulcahy & Kuehner, P.L.L.C., Charles City, for appellant mother.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, and Rachel Ginbey, County Attorney, for appellee State.

Cynthia Schuknecht of Noah, Smith & Schuknecht, P.L.C., Charles City, attorney and guardian ad litem for minor child.

Considered by Danilson, C.J., and Vaitheswaran and Doyle, JJ.

**VAITHESWARAN, J.**

A mother appeals the termination of her parental rights to her child, born in 2014. She raises several issues, one of which we find dispositive: "the failure of the Department of Human Services to provide a sign language interpreter . . . knowing she was hearing impaired."

### I. Background Facts and Proceedings

According to the mother, she was "born deaf." After she gave birth to her son, she showed tendencies toward depression and suicide. The hospital evaluated her, determined she was not a danger to herself or her child, and released her, but not before contacting public service agencies to evaluate and assist her.

The department obtained the mother's consent to provide "safety services." Those services were slated to run for fifteen days but were extended to thirty days. From the outset, the department social workers assigned to the case knew of the mother's hearing impairment and knew she used sign language. The department did not assign her an interpreter to facilitate the "safety services," electing instead to communicate with her in writing. One of the social workers characterized the process as "very difficult."

When the child was one month old, the State filed a child in need of assistance petition. The petition alleged the mother was "deaf and mute and communication is difficult." The petition further alleged the mother lacked basic parenting skills. The child remained with his mother for a month after the petition was filed. During this period, the department did not provide services because the child had yet to be adjudicated in need of assistance.

When the child was two months old, the juvenile court ordered his temporary removal from the mother. The order required an American Sign Language interpreter for the hearing on the removal order. The department did not provide similar interpretive services despite the fact its report filed within twenty-four hours of the removal order stated the mother wrote "notes back and forth to communicate and her conversation skills appeare[d] like that of someone lower functioning."

Within two weeks of the removal order, the mother's attorney moved for reconsideration of the order, asserting, in part, that the mother "is deaf and mute and at no time has the Department involved an interpreter to assist with her communication with [the department and service] provider or the doctor involved in these services despite the Americans with disabilities act." In response, the juvenile court ordered "[t]he Department and providers" to "make every reasonable effort to ensure that an interpreter is available for [the mother] during the provision of services." No interpreter was immediately furnished. By this time, the child was three months old.

The department first furnished an interpreter at a family team meeting and a supervised visit scheduled for the week before a delayed adjudicatory hearing. The juvenile court's adjudication order concluded the department made reasonable efforts to reunify the family. As of the date of the order, four months had elapsed since the child's birth and the department's involvement.

When the child was seven months old, the State filed a petition to terminate the mother's parental rights. At a hearing on the petition, the mother's attorney again raised the department's failure to timely furnish interpreter

4

services.  The court framed the issue he raised as "reasonable effort[s] have not been made to reunify [her] with her child, in particular that interpreter services were not provided."  While the court expressed frustration at the delay in provision of interpreter services, the court stated access to hearing-impaired and other services was more difficult in their "rural area" and "reasonable attempts to adapt to the circumstances to meet the ultimate goal of reunification often must be used until the access obstacles are overcome."  The court also stated the mother "communicated freely through written" notes and sought clarification when necessary.  Finally, the court cited the availability of interpreter services for the final four-and-a-half months of the proceedings and stated the real obstacle to reunification was the mother's decision to do "whatever she wants."  The court terminated the mother's parental rights pursuant to two statutory provisions.  At the time of termination, the child was eight months old.

The mother timely filed a motion for new trial pursuant to Iowa Rule of Civil Procedure 1.1004.  *See* Iowa R. Civ. P. 1.1007 (stating new trial motions under rule 1.1004 "must be filed within fifteen days after filing of the . . . decision").  She asserted the juvenile court impermissibly terminated her parental rights pursuant to a statutory provision not alleged in the State's termination petition.  The juvenile court denied the motion on the ground the mother's parental rights were also terminated under a separate provision alleged in the petition—Iowa Code section 232.116(1)(h) (2015).  The mother filed a notice of appeal within fifteen days of the denial order.

## II. Jurisdiction of Appeal

Iowa Rule of Appellate Procedure 6.101(1)(a) governs the timeliness of appeals from termination-of-parental rights decisions.  It states:

> A notice of appeal from a final order or judgment entered in Iowa code chapter 232 termination-of-parental-rights or child-in-need-of-assistance proceedings must be filed within 15 days after the filing of the order or judgment.  However, if a motion is timely filed under Iowa R. Civ. P. 1.904(2) or Iowa R. Civ. P. 1.1007, the notice of appeal must be filed within 15 days after the filing of the ruling on such motion.

As a preliminary matter, the State contends this court "lacks jurisdiction of the matter because the notice of appeal was not timely filed."  The State concedes the notice was filed within fifteen days of the juvenile court's denial of the new trial motion but asserts the motion "was vague and without merit and, therefore, was insufficient to toll the time for filing a notice of appeal."

Iowa Rule of Civil Procedure 1.1004 authorizes a new trial in several situations, including where "the verdict, report or decision is not sustained by sufficient evidence, or is contrary to law," or where there are "[e]rrors of law occurring in the proceedings, or mistakes of fact by the court."  Iowa R. Civ. P. 1.1004(6), (8).  The mother cited the rule and pointed out the court's error in relying on an unpled statutory termination ground.  Although the mother did not specifically refer to subsections 6 and 8 of rule 1.1004, the juvenile court clearly understood the gravamen of her motion and, while declining to grant a new trial, corrected its error.

The State notes the mother could have raised the error on appeal without filing a posttrial motion.  We agree.  However, her decision to give the juvenile court the first opportunity to correct the error does not render the motion

improper. *See generally Iowa Elec. Light & Power Co. v. Lagle*, 430 N.W.2d 393, 395-96 (Iowa 1988) (stating "[a] district court's power to correct its own perceived errors has always been recognized by this court, as long as the court has jurisdiction of the case and the parties involved").

Nor does the label attached to the motion matter. *Id.* at 395 ("The label attached to a motion is not determinative of its legal significance; we will look to its content to determine its real nature."). The point of the mother's motion was to have the court delete the unpled ground. The mother accomplished this goal and the State concedes this was the correct outcome. We conclude the mother's motion for new trial was timely and proper and tolled the time for filing a notice of appeal. *See McKee v. Isle of Capri Casinos, Inc.*, __ N.W.2d __, 2015 WL 1874608, at *6-7 (Iowa 2015) (rejecting assertion that posttrial motion filed pursuant to rule 1.904(2) was filed for an improper reason and failed to toll the time for filing a notice of appeal); *Sierra Club Iowa Chapter v. Iowa Dep't of Transp.*, 832 N.W.2d 636, 641-42 (Iowa 2013) (concluding rule 1.904(2) motion tolled the time for filing notice of appeal where motion raised legal issues with underlying issues of fact). *Cf. In re Estate of Hord*, 836 N.W.2d 1, 4-5 (Iowa 2013) (noting appellant's argument that new trial motion was valid motion which tolled time for filing notice of appeal if their rule 1.904(2) motion for enlarged findings and conclusions was not, and concluding appeal time was tolled by latter motion). Accordingly, we proceed to the merits.

### III. Reasonable Efforts

The department has an obligation to make reasonable efforts to facilitate reunification. *See* Iowa Code § 232.102(10); *In re C.B.*, 611 N.W.2d 489, 493

(Iowa 2000). Reasonable efforts play "a critical role . . . from the very beginning of intervention." *C.B.*, 611 N.W.2d at 493. The reasonable efforts requirement is "part of [the department's] ultimate proof the child cannot be safely returned to the care of a parent." *See id.* at 492-93 (noting re-lettered provision contained an element "which implicates the reasonable effort requirement"). *See* also Iowa Code § 232.116(1)(h) (requiring proof of several elements including proof the child could not be returned to the mother's custody).

Our de novo review of the record reveals the following facts. According to a department social worker called to the hospital following the child's birth, a nurse told her "communication with [the mother] is very difficult, as she is deaf and mute. They communicate by writing notes, but sometimes what [the mother] writes is difficult to understand."

The social worker immediately tested the mother's written communication skills. The answers to her questions were at best off the mark. Nonetheless, the department cited the mother's written communication skills as a basis for declining to hire an interpreter. Medical records obtained by the department called the department's decision into question.

A psychiatric discharge summary on the mother stated her "ability to express ideas in writing appears somewhat limited." The summary also indicated "possible cognitive inefficiency, particularly with respect to verbal abilities." While finding the mother "better with hands-on visual task[s]," the summary also stated "she might have problems when tasks are more complex or abstract." Another medical note stated the mother "has some speech which is very difficult to understand. She communicates through writing which is, unfortunately, also

difficult to understand." A third medical note characterized the mother as "hearing impaired, sign-language communicating."

As discussed, the department was aware of the mother's comfort with sign language. Indeed, the department reported that the mother "loved" the fact one of her friends used sign language with her. Despite this knowledge, the department did not retain a sign language interpreter for four months.

Notably, the mother and a deaf advocate met with the department case manager approximately three weeks after the department became involved to review the services provided by the department. In response to their request for a new visitation supervisor, the manager said the mother was ineligible for "Targeted Case Management Services." At the same time, the manager said the mother could apply for those services because "she functioned just below average level." There is no indication the manager assisted her in completing the application or facilitated the provision of these more intensive services with the use of an interpreter.

At the termination hearing, the department case manager conceded the importance of an interpreter, stating "it's very helpful to have the interpreter there." She acknowledged she was "to provide clients with . . . their preferred communication," agreed she made no inquiry into the mother's preferred method of communication despite her knowledge of the mother's facility with sign language, and agreed the mother "repeated several times she want[ed] an interpreter."

The visitation supervisor also testified it was easier to use an interpreter than to communicate with the mother in writing. She acknowledged the mother did not understand some of the written notes.

The mother's deaf advocate testified she provided the department with a list of local interpreters approximately two months after the child's birth. She further stated "if [the department] had provided interpreters earlier in the process, it would have made a significant difference in her ability to make progress."

Significantly, the department's nondiscrimination policy, introduced at the termination hearing, requires the department to ensure that "no person will be excluded from participation in, be denied the benefit of, or be otherwise subjected to discrimination for any services because of protected category status." Iowa Dep't of Human Servs., Policy No. 1-D, Nondiscrimination, at 2 (2009), *available at* http://dhs.iowa.gov/policy-manuals/administration. The department manual highlights the importance of interpretative services in implementing this policy. *Id.* at 3-5. The manual specifically holds the department responsible for "[i]dentify[ing] translation and interpretation resources, including their location and their availability" and "[a]rrang[ing] to have these resources available in a timely manner" for those who "are unable to speak, read, write, or understand the English language at a level that permits the person to interact effectively with health and social services agencies and providers." *Id.* at 2, 3. During fifty percent of the department's involvement, the mother lacked the key service necessary to "interact effectively with health and social services agencies and providers." *Id.* at 2. The department's refusal to furnish a sign language interpreter immediately amounted to a violation of its statutory reasonable efforts

obligation and a failure of proof on the statutory termination element cited by the juvenile court.  *See* Iowa Code § 232.116(1)(h).

Having concluded the department did not satisfy its statutory obligation to make reasonable efforts towards reunification, we find it unnecessary to address the mother's contention that the department's failure to provide interpretative services also violated the Americans with Disabilities Act ("ADA").  In declining to reach this issue, we have canvassed opinions addressing both statutes.  Certain states view the obligations under each statute as co-extensive.  *See J.H. v. State, Dep't of Health & Soc. Servs.*, 30 P.3d 79, 86 n.11 (Alaska 2001) (noting Alaska statutory requirement "that the department make reasonable efforts to provide [mother] with family support services appears to be essentially identical to the ADA's reasonable accommodation requirement.  Accordingly, we need not independently address [the mother's] ADA theory in disposing of her appeal"); *In re Terry*, 610 N.W.2d 563, 570 (Mich. Ct. App. 2000) (finding no conflict between ADA and Michigan's Juvenile Code, which requires court to determine whether agency made "reasonable efforts" to correct conditions that led to its involvement and finding consistency between reasonable efforts requirement and reasonable accommodation requirement of ADA).  Certain others hold the termination statute controls.  *See In re Torrance P.*, 522 N.W.2d 243, 245-46 (Wis. Ct. App. 1994) ("The duty to make a diligent effort to provide court-ordered services is defined by the TPR statutes and not the ADA.  The ADA does not increase those responsibilities or dictate how those responsibilities must be discharged. . . . Because the ADA does not affect our inquiry of whether the County made a diligent effort to provide [the father] with court-ordered services as required under

[the Wisconsin termination statute], we do not determine whether the County reasonably accommodated [the father's] disability."). Still others affirmatively preclude parents from raising the ADA as a defense to a termination action but address accommodation issues in the context of their reasonable efforts requirement. *See, e.g., In re Doe*, 60 P.3d 285, 293 (Haw. 2002) (declining to allow parent to raise violation of ADA as a defense to a termination proceeding but noting department has obligation to make reasonable efforts to reunify parent and child); *In re C.M.S.*, 646 S.E.2d 592, 595 (N.C. Ct. App. 2007) (noting because state statute required department to make reasonable efforts to prevent or eliminate need for placement, ADA did not prevent state from terminating mother's parental rights).

Iowa has alluded to the ADA in several termination opinions. *See generally In re C.M.*, No. 04-1052, 2004 WL 1900100, at *2 (Iowa Ct. App. Aug. 26, 2004) (noting ADA "requires a public entity to make 'reasonable accommodation' to allow a disabled person to participate in services"); *In re K.K.*, No. 04-0166, 2004 WL 574685, at *1 (Iowa Ct. App. Mar. 24, 2004) ("assuming without deciding the mother has a qualifying disability under the ADA" and concluding department reasonably accommodated mother); *In re A.M.*, No. 99-420, 1999 WL 780586, at *3-4 (Iowa Ct. App. Sept. 29, 1999) (noting "under the ADA, a public entity is prohibited from discriminating against a disabled person by excluding him or her from participation in public services, programs, or activities" and must make "reasonable accommodation"); *In re C.M.*, 526 N.W.2d 562, 566 (Iowa Ct. App. 1994) (noting "[t]he ADA prohibits a public entity from discriminating against a disabled person by excluding her from participation or by

denying the benefits of public services, programs, or activities") (citing 42 U.S.C. § 12132 (1993), which provides "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity").   However, our appellate courts have not precisely defined the relationship between the two statutes.   *See generally* Jude T. Pannell, *Unaccommodated: Parents with Mental Disabilities in Iowa's Child Welfare System and the Americans with Disabilities Act*, 59 Drake L. Rev. 1165 (2011); Dale Margolin, *No Chance to Prove Themselves: The Rights of Mentally Disabled Parents under the Americans with Disabilities Act and State Law*, 15 Va. J. Soc. Pol'y & L. 112 (Fall 2007); Teri L. Mosier, Note, *"Trying to Cure a Seven-Year Itch": The ADA Defense in Termination of Parental Rights Actions*, 37 Brandeis L.J. 785 (Summer, 1998-1999).   Our disposition is not inconsistent with prior Iowa authority.

We reverse the juvenile court's termination of the mother's parental rights to her child and remand for an order pursuant to Iowa Code section 232.117(2) dismissing the termination petition as to her.

**REVERSED AND REMANDED.**