# IN THE COURT OF APPEALS OF IOWA

No. 18-1167
Filed September 12, 2018

**IN THE INTEREST OF E.C.,**
**Minor Child,**

**E.M., Father,**
     Appellant.

_____

Appeal from the Iowa District Court for Cass County, Amy L. Zacharias, District Associate Judge.

The father appeals from the termination of his parental rights. **REVERSED AND REMANDED.**

Gina C. Badding of Neu, Minnich, Comito, Halbur, Neu & Badding, PC, Carroll, for appellant father.

Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee State.

Karen L. Mailander of Mailander Law Office, Atlantic, guardian ad litem for minor child.

Considered by Potterfield, P.J., and Bower and McDonald, JJ.

**POTTERFIELD, Presiding Judge.**

The father appeals the termination of his parental rights to his child, E.C., born in July 2014. The juvenile court terminated the father's parental rights pursuant to Iowa Code section 232.116(1)(d), (h), and (i) (2018). The father challenges the statutory grounds, maintains termination is not in E.C.'s best interests, and argues a permissive factor weighs against termination. He asks us to reverse the termination and return E.C. to his care but argues in the alternative that the juvenile court should have given him an extension of time to work toward reunification.

**I. Background Facts and Proceedings.**

E.C., the child at issue, is the daughter of the mother and the father. E.C.'s older half-sibling, J.L., has the same mother, Beth, but is not the biological child of the father.[1] At the time these proceedings began, in September 2016, Beth was caring for E.C. and J.L. and was no longer in a relationship with J.L.'s father or with E.C.'s s father.

Both children were removed from the mother's care by emergency order after she was arrested for driving while under the influence of methamphetamine; E.C. was in the vehicle at the time. The reason is unclear, but the Iowa Department of Human Services (DHS) did not immediately make contact with the father. Instead, both E.C. and J.L. were placed in shelter care.

In November 2016, both children were adjudicated a child in need of assistance (CINA) pursuant to Iowa Code section 232.6(b), (c)(2), and (n) (2016).

---

[1] J.L.'s father never took part in services. When we refer to "the father" throughout, we mean E.C.'s father.

Around the same time, the mother moved into the father's home, and they resumed a relationship. The pair received services together, and both E.C. and J.L. participated in visits together with both the mother and the father.

DHS continued to have concerns about the mother's mental health and her ability to refrain from using methamphetamine, but the department believed the father was a positive support for her. As of April 2017, DHS reported to the court that the father was "a responsible and caring father figure to both children." Similarly, in its April 2017 combined review/modification order, the court noted the father "has been cooperative and receptive to feedback. [He] is employed and provides for the family." The parents progressed to semi-supervised visits with the children.

As of July 2017, DHS scheduled a one-week trial period for the children to be in the mother and father's care. When the service provider dropped the children off at the home, the mother and father had been arguing. The next day, the service provider returned to the family home "to help de-escalate" and asked the father to leave. The father told the service provider he was ending his relationship with the mother and moving out. Both E.C. and J.L. were left in the mother's care. However, later that day, DHS received a call on the child-abuse intake hotline, during which the caller alleged the mother had taken the children to get physicals and appeared "twitchy," "anxious," and "fidgety." The service provider returned to the family home to check on the mother, who admitted she had not been taking her anti-anxiety medication or attending therapy. The unsupervised visit was then ended early, and the children were placed in foster care near the mother's home.

The mother took a drug test that day, which later returned positive results for methamphetamine and amphetamines.

After the father moved out of the family home, the parents started receiving separate services and visits. The visits returned to fully supervised for both parents. J.L. told DHS he did not want to attend visits with the father, and J.L. began attending them only sporadically. The father often asked about J.L. and indicated he would like to see him and wanted to continue to be a placement option for him.

The notes from the September 2017 family team meeting indicate "needs" for the mother, including attending parenting class, mental-health therapy, and medication management. The "family goal" states, "[The mother] will maintain sobriety and manage her mental health, for a period of six consecutive months, as evidenced by maintaining a regular routine including sleep times, regulating and managing her anger, and communicating better with others." Additionally, the mother agreed to engage in a number of things, such as drug testing. The notes are silent as to any needs or goals for the father, other than stating he agrees to participate in drug testing, as required. There is no evidence in the record DHS ever asked the father to participate in drug testing other than taking the initial drug evaluation at the beginning of the proceedings, which indicated the father did not need any follow up.

In its September permanency review order, the court noted the father had been encouraged to move out of the home of his new girlfriend—where he had relocated after the mother made him move out—and in a short time, the father had done so, moving to a new town, paying rent and utilities, and obtaining the

necessary furniture and household items for the home. The father attended J.L.'s soccer practices and visited E.C. at her daycare; he called the foster family daily to check on the children and speak with them. The court stated, "[The father] has really made progress as he has a home and is willing for both children to come live with him." The court noted the ultimate goal was to transition both E.C. and J.L. to the father's care and listed as the only impediment that the father lacked legal citizenship.

The father had a number of unsupervised visits with E.C. In the service provider's report of visits that took place between September 20 and October 20, 2017, the provider noted as a "strength" that the father "positively interacts with the child[] and uses age-appropriate discipline such as time outs. [The father] is bonded with the child[] as evidenced by affection he shows the child[] by holding, hugging and kissing the child[]. [The father] struggles with disciplining [E.C.]." Additionally, the provider reported the father's "protective capacities have slightly increased in this reporting period as he consistently attended visits with the child[], has been cooperating with [family safety, risk, and permanency (FSRP)] services, is receptive to parenting skills taught by FSRP and is following DHS recommendations."

In early November 2017, the father took the children out of the county during his unsupervised visit. DHS then ended his supervised visits "due to him not following DHS guidelines." There is no indication the father took the children somewhere unsafe or with unsafe individuals. In the social worker's December report to the court, the worker indicated visits returned to supervised because J.L. reported that during an unsupervised visit, the father and his girlfriend went into

their bedroom and shut the door. According to J.L., the father reported he was taking a nap. In the same report, the social worker noted, "There have also been concerns expressed that [the father] is not bonded to [J.L.] and will focus his attention on [E.C.] during the visits. It is reported that [J.L.] is aware of [the father's] lack of attention and becomes emotionally upset." For the "permanency goal and plan," the worker stated:

> At the last court hearing [DHS] offered a modified permanency plan for both children. On behalf of [E.C.], the permanency goal was to place with her father . . . . The permanency goal for [J.L.] was to place with [the father], suitable other. It was hoped this could occur following increased and successful interactions between the children and [the father]. However, [the father] is still struggling with his parenting and he is having difficulty attaching to [J.L.].

In her report to the court, the guardian ad litem (GAL) encouraged the court to reconsider the goal of reunification, stating, "[The father] has also struggled to focus on the children, and his lack of bond with [J.L.] is a huge concern."

In a January 2018 addendum to a previous court report, the social worker wrote at length about a conversation she had with the father's immigration attorney, emphasizing that the paperwork for lawful immigration that the father had filled out "is not something that happens quickly and could take 6-8 months as immigration is backlogged" and that it "could take 20 to 24 months to get a green card if each step along the way is approved." The worker also stated that the father was unable to follow through with parenting the children. She asked the court to change the permanency goal to that of termination.

In the GAL's May 2018 report to the court, she stated her strong belief that the court should grant the petition for termination, indicating, "Above all, I would

want to see [E.C.] and [J.L.] stay together. They are very bonded and have weathered a great deal of trauma together."

The termination hearing took place in June, and the court terminated both the mother's and the father's parental rights. Only the father appeals.

## II. Standard of Review.

We review termination proceedings de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). "There must be clear and convincing evidence of the grounds for termination of parental rights." *Id.* "Clear and convincing evidence is more than a preponderance of the evidence and less than evidence beyond a reasonable doubt." *In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016). "It is the highest evidentiary burden in civil cases." *Id.* "This significant burden is imposed on the State to minimize the risk of an erroneous deprivation of the parent's fundamental liberty interests in raising his child." *Id.*

## III. Discussion.

"Our review of termination of parental rights under Iowa Code chapter 232 is a three-step analysis." *M.W.*, 876 N.W.2d at 219. The first step is to determine whether any ground for termination under section 232.116(1) has been established." *Id.* Only if we find a statutory ground for termination supported by clear and convincing evidence, we proceed to consider if termination is in the best interests of the child. *See id.* at 219–20 (stating we proceed to the second step "if we find that a ground for termination has been established"). Finally, we determine whether the parent has proven the existence of a permissive factor weighing against termination. *See id.* at 220.

Here, the State's petition to terminate the father's parental rights alleged termination was appropriate under paragraphs (d), (h), and (i). The juvenile court then purportedly terminated the father's rights pursuant to each of the three grounds. We have some question whether the juvenile court's statement at the conclusion of its ruling that all three subsections were proved as to the father was a scrivener's error, as the court's finding of facts relating to paragraphs (d) and (i) contain findings pertaining only to Beth. There is a "general principle that in termination of parental rights proceedings each parent's parental rights are separate adjudications, both factually and legally." *In re D.G.*, 704 N.W.2d 454, 459 (Iowa 2005). But even if the court's ruling contained a scrivener's error and the juvenile court did not actually find sufficient evidence under each of the grounds, we must consider all three, as we may affirm on any ground raised before the juvenile court. *See M.W.*, 876 N.W.2d at 221.

The court may terminate parental rights according to section 232.116(1)(d) if there is clear and convincing evidence to support both of the following:

> (1) The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.
> (2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

There is not clear and convincing evidence to support this paragraph; the court made no finding of physical abuse or neglect or imminent likelihood of abuse or neglect. *See In re A.R.*, 865 N.W.2d 619, 623 (Iowa Ct. App. 2015), *overruled on*

*other grounds by M.W.*, 876 N.W.2d at 221. "[I]t is plain to see that a termination under (d) requires a physical injury." *Id.* at 623–24. "In other words, we may not rely on the term 'or neglected,' as the supreme court has explained the term of art 'physical abuse or neglect' requires a nonaccidental injury." *Id.* at 624. In the CINA adjudication order, the juvenile court found that E.C. and her older sibling are "at a direct risk of harm if Beth is under the influence of illegal substances when caring for them," but this supports the adjudication under section 232.2(6)(c)(2) rather than (6)(b). *See In re J.S.*, 846 N.W.2d 36, 41–42 (2014) (determining that general statements about the mother's admitted methamphetamine use, her repeated positive drug tests, and current methamphetamine addiction "are not enough by themselves to prove that a child is imminently like to suffer physical harm under section 232.2(6)(b)"). "[A] CINA determination under section 232.2(6)(b) may lead to termination of parental rights under section 232.116(1)(d), whereas a CINA determination under section 232.2(6)(c)(2) cannot." *Id.* at 41. Here, because the court failed to make any findings in the adjudication order that E.C. or J.L. were "physically or sexually abused or neglected," within the statutory meaning, the first element of paragraph (d) is not met. There is insufficient evidence to support termination of the father's parental rights under Iowa Code section 232.116(1)(d).

For the same reasons as stated above, we conclude that there is not clear and convincing evidence in the record to support termination of the father's parental rights pursuant to section 232.116(1)(i), which allows the court to terminate if:

> (1) The child meets the definition of child in need of assistance based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of one or both parents.

(2) There is clear and convincing evidence that the abuse or neglect posed a significant risk to the life of the child or constituted imminent danger to the child.

(3) There is clear and convincing evidence that the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time.

There have been no findings of physical or sexual abuse, and "[n]eglect means physical injury." *In re K.A.*, No. 03-1301, 2004 WL 61117, at *4 (Iowa Ct. App. Jan. 14, 2004) (citing Iowa Code § 232.2(42) (defining "physical abuse or neglect" or "abuse or neglect" as "any nonaccidental physical injury suffered by a child)). Moreover, even if the juvenile court's findings about Beth's use of methamphetamine while parenting and driving E.C. met the definition, this does not make the provision applicable to the father. *See, e.g.*, *In re J.C.*, No. 14-0100, 2014 WL 1234432, at *4 (Iowa Ct. App. Mar. 26, 2014) ("We are left with section 232.116(1)(i), which requires proof of several elements, including proof that 'the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time.' As discussed, the department did not identify conditions that needed to be corrected with respect to this father and, for all practical purposes, did not offer services. This ground for termination was not satisfied.").

Finally, we consider whether the conditions for section 232.116(1)(h) have been met. The court may terminate pursuant to paragraph (h) if:

(1) The child is three years of age or younger.

(2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

(3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Iowa Code § 232.116(1)(h). The only element in dispute is the fourth—whether E.C. could have been returned to the father's care at the time of the termination hearing. Pursuant to section 232.102(11), the out-of-the-home placement "shall be terminated and the child returned to the child's home if the court finds by a preponderance of the evidence that the child will not suffer" another adjudicatory harm.

It is unclear what adjudicatory harm the juvenile court believed E.C. would suffer if the out-of-home placement was ended. As he has throughout the entire duration of this case, the father has employment and a safe home. There have never been any concerns about his mental health or improper use of alcohol or drugs. Moreover, when the mother and father were dating again and the mother relapsed on methamphetamine, the department told the father he had to choose between the mother and the children; the father immediately ended the relationship and moved toward parenting both children[2] on his own.

During his closing argument, the father argued the department was "nitpicking his parenting style and because of that they are artificially keeping him from" E.C. We agree with him, to an extent. For one, the social worker testified at length about the "ongoing issue" of the father "often bring[ing] gifts" for E.C. to visits. There was no testimony the gifts were unsafe or otherwise not appropriate

---

[2] For a period of time, the department considered placing J.L. with the father as a "suitable other." *See* Iowa Code § 232.102(1)(a)(1) (providing that the court may enter an order transferring the legal custody of a child to a "parent who does not have physical care of the child, other relative, or other suitable person").

12

for E.C.'s age, and the father has been financially independent for the life of this case. We struggle to comprehend the department's negative emphasis on a parent choosing to spend their extra money on their child. Additionally, when asked about safety concerns she has, the social worker testified the father often lets E.C. choose what equipment or activity she wants to play at the park during visits. When asked to explain herself further, she did not disagree that the father was supervising and participating with the child but testified the issue was that the father was following along rather than "set[ting] the standards."

The social worker testified about some struggles J.L. and the father have had in their relationship. She then testified that the older child has verbalized that he is ready for permanency; she focused on how detrimental it could be to E.C. if the father's rights were not terminated and, as a result, E.C. and J.L. no longer lived together in one home. We understand the juvenile court was receiving evidence regarding two children and three parents, but there are no parental rights between J.L. and the father. And while we recognize that the department thinks these siblings need to remain together, that is not part of the statutory-grounds analysis. Yet in its written ruling, the juvenile court concluded subsection (h) applied, in part, because the father shows a lack of bond with J.L.

Finally, the service provider testified the father is unable to redirect E.C. without help from the service provider and chooses to spend visits on his phone rather than spending time with E.C. We acknowledge there are some instances in the record that supports this testimony, but not enough to support the court's finding in the written termination order that "there was no parenting style to 'nitpick' because there was not parenting [by the father]."

Upon our de novo review of the record, there is not clear and convincing evidence E.C. would be at risk of suffering an adjudicatory harm if returned to the father's care. *See* Iowa Code § 232.116(1)(h)(4). We understand this may mean that she is separated from J.L. and understand why that is a concern, but we cannot get ahead of ourselves. E.C.'s perceived best interests of remaining with her half-sibling does not override our mandate to apply the three-step framework as written, first determining if there is a statutory ground for termination. Moreover, the question of the father's citizenship has no bearing on whether E.C. can be returned to his care; citizenship is not a requirement of being an able parent. Because there is not a statutory ground for termination, we may proceed no further in the three-step framework toward termination. Nor would we want to, as the father has a fundamental liberty interest in the care, custody, and control of E.C. *See In re K.M.*, 653 N.W.2d 602, 607 (Iowa 2002).

We reverse the juvenile court's termination of the father's parental rights to E.C. and remand for an order pursuant to Iowa Code section 232.117(2) dismissing the termination petition as to him. *See In re J.L.,* 868 N.W.2d 462, 468 (Iowa 2015).

**REVERSED AND REMANDED.**