# IN THE COURT OF APPEALS OF IOWA

No. 24-0232
Filed May 8, 2024

**IN THE INTEREST OF A.D.,**
**Minor Child,**

**B.D., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Grundy County, Daniel L. Block, Judge.

A father appeals the termination of his parental rights to his one-year-old daughter. **REVERSED AND REMANDED.**

Rachel Antonuccio of Waterloo Juvenile Public Defender's Office, Waterloo, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Jennie Wilson-Moore of Wilson Law Firm, Conrad, attorney and guardian ad litem for minor child.

Considered by Tabor, P.J., and Badding and Buller, JJ.

**TABOR, Presiding Judge.**

A.D. will turn two this month. In January, the juvenile court terminated the parental rights of her mother and father—focusing on their history of substance use and unmet mental-health needs. Her father, Bradlee, appeals the termination, raising six issues.[1] First, he asks for six more months to reunify. Second, he challenges reasonable efforts. Third, he contests the grounds for termination. Fourth, he contends that termination is not in A.D.'s best interests. Fifth, he argues that creating a guardianship for A.D. would be preferable to termination. And sixth, he seeks reversal based on the court's reliance on an "invalid" position by the guardian ad litem (GAL).

After our independent review of the record, we conclude that continuing A.D.'s relative placement for another six months is appropriate, given Bradlee's positive parenting skills and his progress in addressing his substance use and mental health. *See* Iowa Code § 232.104(2)(b) (2023). We respect the juvenile court's determination that it is not in A.D.'s best interests to wait longer for permanency. But in our de novo review, we reach a different result.[2] Thus, we reverse the termination order and remand for further proceedings.

## I. Facts and Prior Proceedings

A.D.'s mother used methamphetamine while pregnant. After A.D.'s birth, the placenta tested positive for the drug at an elevated level. On the State's

---

[1] The mother did not appear at the termination hearing and does not appeal.
[2] We review termination proceedings de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). We respect the juvenile court's fact findings, especially when they rest on witness credibility. *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998). But we are not bound by them. *Id.* Our primary concern is the best interests of the child. *Id.*

petition, the juvenile court adjudicated A.D. as a child in need of assistance (CINA) in July 2022. After the adjudication, A.D. lived with Bradlee and his mother, April, under a safety plan developed by the Iowa Department of Health and Human Services. The grandmother was the primary caretaker, but Bradlee shared responsibility for meeting his daughter's daily needs.[3]

Yet Bradlee's history of substance use remained an obstacle to resuming custody of A.D. That summer, MercyOne Hospital referred Bradlee for inpatient treatment at Pathways Behavioral Services, but he did not follow through. He did obtain a substance-use evaluation from Pathways in September 2022. The provider diagnosed him with severe amphetamine-use disorder, substance-use-related bipolar disorder, and post-traumatic stress disorder. The provider recommended outpatient treatment. In its December 2022 dispositional order, the court expressed concern that Bradlee was not engaging in treatment and was not cooperating with the department's drug-testing demands.

But the court did find that Bradlee exhibited "many positive parenting skills" in his daily contact with A.D. That finding was supported by the service provider progress report affirming that A.D. was healthy and developmentally on track and "[h]er needs are met by Bradlee and April."[4]

Despite that finding, a newly assigned case manager, Darci Hernandez, told the grandmother in December that she could not continue as a placement for A.D.

---

[3] Bradlee married T.D. in August 2022. She also lived with April, participating in A.D.'s care. In September, the GAL reported that A.D. was "in a safe environment" at her grandmother's home.

[4] That's not to say everything was rosy in that progress report. The service provider pointed out that Bradlee was not engaged in services.

if Bradlee stayed in her home. Hernandez testified that the department believed that Bradlee could not remain in April's home because he was not complying with drug testing and treatment recommendations. Although the department's ultimatum surprised April, she asked Bradlee to move out by January 2023. That request stunned Bradlee who testified that he had been providing much of the everyday care for A.D.

Shortly after leaving his mother's home, Bradlee underwent a two-day psychiatric commitment at Wheaton Franciscan Healthcare in Waterloo. Bradlee's hospital records state that "he was using meth when he was placed in jail on Sunday," but the hospital toxicology report showed that he was negative for all illicit substances. The discharge recommendations were for medication management and outpatient therapy for mental-health issues. But no treatment was recommended for substance-use issues. On a related note, Bradlee obtained a medical cannabidiol registration card in February 2023.

Belying its earlier explanations, even after Bradlee moved out, the department decided to end A.D.'s placement with her grandmother. In March 2023 case manager Hernandez decided that the "deplorable" condition of April's home was unsafe for a small child. Within hours of the social worker advising April that her residence would not be approved for a home study in its current condition, the house caught fire, leaving it uninhabitable. Without stable housing, April was no longer a placement option for A.D. So the department placed the child with Bradlee's cousin and her husband. One month later, the State petitioned for termination of parental rights.

Meanwhile, Bradlee returned to Pathways in April 2023 for another evaluation. The evaluator recommended intensive outpatient treatment. Bradlee started attending services consistently and his counselor reported: "Bradlee appears to be genuinely attempting to participate productively in treatment services, but mental health symptoms do appear to be a significant barrier to doing so at this time."

The court held a hearing on the termination petition in 2023. Case manager Hernandez recommended termination based on Bradlee's marijuana use: "I guess bottom line, [his] denial of wanting to quit marijuana, I don't think that [A.D.] could be safely returned to him at this time." Hernandez acknowledged on cross-examination that Bradlee had missed only one drug-treatment appointment in three months but remained skeptical of his commitment: "His attendance is an improvement, however, I would say his grasp of sobriety is not an improvement." Hernandez also agreed that Bradlee was "doing medication management" but would not concede that he was doing enough to address his mental health.

As for parenting interactions, Hernandez testified on direct examination that Bradlee had only weekly visits with A.D. But on cross, she conceded that the visits had actually increased to twice a week—the second visit supervised by the relative placement. Even with that concession, the case manager testified that the increased frequency of visits did not indicate "a ton of progress being made." Yet Hernandez also admitted on cross that Bradlee had good parenting skills. When asked if Bradlee was observed "feeding her, changing her diaper, playing with her, cuddling with her, all of those things," Hernandez agreed, "Yes, that's correct." Still, in questioning by the GAL, Hernandez predicted that even if Bradlee complied

with all department recommendations it would be "at least six months" before he could move to semi-supervised visits.

The service provider was more willing to credit Bradlee's progress. He testified that in the past three months Bradlee had become a more "energetic and engaged" parent during visitations. And the provider agreed that A.D. is always happy to see her father. Both Bradlee and his wife, T.D., testified that they had a strong bond with A.D. She calls Bradlee "dada" and calls T.D. "mommy." They described their apartment, which was furnished with a crib, highchair, and other childhood necessities. Bradlee testified that he never had a founded child abuse report and intended to cooperate with the department to ensure A.D.'s safety. T.D. also voluntarily obtained a "hair 5 drug panel" test from Omega Laboratories that was negative for all illicit substances.[5]

At the close of the hearing, Bradlee's counsel asked for "an extension of time so [Bradlee] could continue to improve and continue to show the court and parties that he's able to resume care for his daughter." The GAL joined in that request. The court took the matter under advisement.

In early July 2023—before the court ruled—the department filed a laboratory report from PharmChem, Inc. showing that Bradlee's "sweat testing" results were positive for methamphetamine. (The results were negative for amphetamines, marijuana, and other drugs.) In response, Bradlee's counsel filed a notice asserting that a drug prescribed to Bradlee "has been known to cause false positives for amphetamine."

---

[5] The parties refer to the Omega Lab screening as a "HairStat" test, so we will use that description as well.

Two days later, the department submitted to the court an email thread between social workers and lab representatives entitled "Drug testing issue results and needed support from Lab." The social work supervisor noted that Bradlee's urine tests from May 3 and May 9 were only positive for marijuana, but the sweat tests from May 30 and June 19 were positive for methamphetamine. The supervisor also noted that he didn't see a "positive result for amphetamines." A PharmChem senior account manager responded:

> I won't address the urine samples as they have no bearing on the two sweat patch results. They are not even in the same time frame. Also note, UA testing is nothing more than spot testing and patch testing is a continuous collection of a sample that truly represents a 24/7 monitoring for drugs of abuse. . . . The two samples meet EVERY qualification to report out the Methamphetamine POS. The reason why AMP is NEG on the SCREENING (not confirmation) is due to the fact that the value is below 10 ng/mL. The only reason AMP is reported out is in relation to the Methamphetamine POS. The report is indicative of Methamphetamine use.

Then, in August 2023, Bradlee's sweat patch tested positive for methamphetamine, cocaine, and THC. To counter, Bradlee's counsel filed a "Motion for Reasonable Efforts"—citing Iowa Code section 232.102(4)(b) and (7). The motion stated: "The father disputes the results of his sweat patch tests and has requested hairstat drug testing." The motion noted that the department had twice refused to provide the requested testing and asserted: "If the Department is confident about the sweat patch results, there is no reason to deny the father his requested hairstat test."

To address those filings, the court reopened the record and scheduled another evidentiary hearing for September 2023. At that hearing, Bradlee's counsel asked to continue the termination proceedings to allow for HairStat testing.

The juvenile court granted that request.[6] Omega Laboratories tested Bradlee's hair—collected on September 20—and returned negative results for methamphetamine, amphetamine, and cocaine, but positive for THC.

It was three months before the matter was back in court. On the eve of that December hearing, the State asked to present the testimony of Dr. Leo Kadehijan, a toxicologist, either by telephone or Zoom. Bradlee's counsel objected to the late notice. The court excluded the witness, ruling that "it was more than can be expected of counsel to be prepared for that" expert testimony just twenty-four hours ahead of the hearing.

Instead, the State called case manager Hernandez who testified that, in the department's eyes, Bradlee's negative result for methamphetamine on the HairStat test did not "negate the positive sweat tests." When the State asked why, Hernandez started to say: "It's well known in the toxicology community that hair tests—" She was cut off by an objection from Bradlee's counsel that Hernandez was not a toxicology expert. The court cautioned the witness to testify only to her own knowledge and experience. Hernandez then testified that she received information from PharmChem explaining that Bradlee's sweat tests were valid. She also reported that his sweat patches tested positive for methamphetamine and THC two days before the hearing.

On cross-examination, Hernandez testified that she did not believe it was relevant that Bradlee's HairStat test was only positive for THC.

---

[6] The court also continued the hearing so that the GAL could be present. The GAL could not attend the hearing because of a scheduled medical procedure. A substitute GAL attended but lacked familiarity with the case.

> Q. So the positive drug tests are all relevant but the negative drug tests or the tests that confirm what [Bradlee] has been saying to you are not relevant?  A. The hair test was positive for THC.
>
> Q. And [Bradlee] has admitted to using THC and has a medical marijuana card; correct?  A. He does have a medical marijuana card.
>
> Q. The department regularly uses HairStat testing as a mechanism to determine whether parents are using drugs, don't they?  A. It's one test.
>
> Q. And HairStat tests are used to remove kids and terminate rights or provide proof that parents are dishonest about their claims about drug use; correct?  A. I would say that all testing is used.  I don't think one outweighs the other on which one is used for what.
>
> Q. But you believe that [Bradlee's] HairStat that verifies what he is saying to be true is not valid?  A. I don't know.

The case manager agreed that the department works with parents who acknowledge "that there is a substance abuse issue" but asserted that Bradlee showed "zero" follow-through with treatment or relapse prevention.  The case manager also testified that A.D. could not safely be returned to Bradlee's custody because of "his lack of consistent engagement in the entirety of a visit."  But she acknowledged that she had not been to one of his visits with A.D. since October–almost two months before the termination hearing.  And the case manager could not confirm whether she had seen Bradlee with A.D. more than five times in the year that she had been assigned to the case; she acknowledged that she had not consistently been meeting with Bradlee on a monthly basis.  In his testimony, Bradlee denied using methamphetamine or cocaine during the CINA case.  He also testified that his psychiatric provider said his medication could cause false positives on drug screenings "but upon further testing they should be able to tell."  Yet the department offered no further testing.  Bradlee was also scheduled to restart substance-use treatment at Pathways.

The parties filed written closing arguments. Bradlee requested A.D.'s return to his custody under Iowa Code section 232.104(2)(a). Alternatively, he asked the court to defer permanency for six months under section 232.104(2)(b). As part of that deferral, he sought four services:

> a. An immediate increase in visit frequency;
> b. Permission for [T.D.] and [April] to supervise interactions and/or a decrease from supervised to semi-supervised visitation;
> c. Monthly meetings with the Department to assess progress, timely and directly communicate any concerns, and ensure the parties continue to move forward;
> d. An order requiring the Department to perform further testing on any patch that comes back positive for a substance other than THC.

On the other side, the State advocated for termination, urging that neither parent could provide a safe home for A.D.: "Substance abuse issues demonstrated by positive sweat patch results and refusal to engage in substance abuse treatment by [Bradlee] paint a picture of an environment that is not conducive to the well-being of the child."

After the deadline for submitting closing arguments, the GAL filed a three-sentence report joining the State's recommendation to terminate parental rights.

In January 2024, the juvenile court terminated Bradlee's parental rights under Iowa Code section 232.116(1), paragraphs (e), (h), and (*l*). The court did not believe that Bradlee was being honest about his drug use:

> [He] continues to test positive for marijuana and methamphetamines. [He] believes his psychotropic medications are responsible for his positive drug tests for methamphetamines. [He] denies any current use of methamphetamines. [He] has proven to not be a reliable reporter. Until [he] acknowledges his substance abuse he is unable to overcome his addiction.

Bradlee appeals.

## II. Analysis

Bradlee first requests a "six-month extension to work toward permanency with A.D." To continue placement, the court must determine the need for removal will no longer exist at the end of the extension. *See* Iowa Code § 232.104(2)(b). In making that prediction, the court must consider Bradlee's past performance and current progress. *See In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005) ("Under some circumstances extensions could be appropriate.").

The juvenile court rejected Bradlee's plea for more time, relying on the GAL's revised recommendation:

> The child's attorney and [GAL] initially requested that permanency be deferred at the hearing on June 13, 2023, however, after nearly six more months of services while the subsequent hearing was scheduled on December 19, 2023, the [GAL] is joining in the State's recommendations for termination of parental rights. It is not in the child's best interests that proceedings be continued an additional six months. The father's request that he be given an additional six months is without merit. The family has received services through the Juvenile Court for over one and one-half years. [Bradlee] refuses to acknowledge the concerns which led to the child's removal, the effects his substance abuse and unmet mental needs have on his parenting abilities.

Bradlee claims the court did not properly consider his improved performance—notably substance-use evaluations and treatment, medication management for his mental health, increased visitations, and stable housing.

Beyond those considerations, Bradlee challenges the court's reliance on the GAL's recommendation because—in his view—the GAL did not comply with statute setting out the duties of that appointed position.

> Unless otherwise enlarged or circumscribed after a finding of good cause by a court or juvenile court having jurisdiction over the child or by operation of law, the duties of a guardian ad litem with respect to a child shall include the following:

(1) Conducting in-person interviews with the child, if the child's age is appropriate for the interview, and interviewing each parent, guardian, or other person having custody of the child, if authorized by counsel.

(2) Conducting interviews with the child, if the child's age is appropriate for the interview, prior to any court-ordered hearing.

(3) Visiting the home, residence, or both home and residence of the child and any prospective home or residence of the child, including each time placement is changed.

(4) Interviewing any person providing medical, mental health, social, educational, or other services to the child, before any hearing referred to in subparagraph (2).

(5) Obtaining firsthand knowledge, if possible, of the facts, circumstances, and parties involved in the matter in which the person is appointed guardian ad litem.

(6) Attending any hearings in the matter in which the person is appointed as the guardian ad litem.

. . . .

(8) Submitting a written report to the juvenile court and to each of the parties detailing compliance with this subsection. . . . A written report shall be submitted for each court hearing unless otherwise ordered by the court.

Iowa Code § 232.2(25)(b).[7]

The definition of GAL also addresses the best-interests determination, identifying the chief objective as reunification over termination:

In determining the best interests of the child, rather than relying solely on a guardian ad litem's life experiences or instinct, a [GAL] shall, with the primary goal of achieving permanency for the child by preserving the child's family or reunifying the child with the child's family, do all of the following:

(1) Determine the child's circumstances through a full, independent, and efficient investigation, including the information gathered from the child's medical, mental health, and education professionals, social workers, other relevant experts, and other sources obtained in accordance with this subsection.

(2) Assess the child and the totality of the child's circumstances at the time of each placement determination, including any potential trauma to the child that may be caused by any recommended action.

---

[7] This code section was revised in 2022 to expand the GAL duties. *See In re N.W.*, No. 22-1946, 2023 WL 1813629, at *2 (Iowa Ct. App. Feb. 8, 2023). It was renumbered in 2023 from Iowa Code section 232.2(22) to section 232.2(25).

> (3) Examine all options available to the child in light of the permanency plans.
> (4) Incorporate a child's expressed wishes in recommendations and reports.

*Id.* § 232.2(25)(e).

Bradlee asserts that the GAL's September 2023 report to the court did not comply with the Code.[8] Plus, the GAL filed no report before the December hearing. Bradlee adds: "The GAL did not make a recommendation at the hearing or update the court with information about her contact with the child or any of the other information statutorily required." When the GAL finally filed a report on December 28, 2023, it concluded that termination was in A.D.'s best interests without any supporting information.[9] As his bottom line, Bradlee contends: "There is no clear record of whether the GAL had any direct contact with her client or any information explaining the basis of her decision to recommend termination, yet her position was cited in the court's ruling for termination."

---

[8] That report stated:
> 1. That since the time of the termination hearing, new positive drug screens have been filed for the father.
> 2. That the undersigned is no longer in support of six more months.
> 3. That the undersigned joins in the recommendation of [the department] for termination.

[9] That report stated:
> 1. That the undersigned attended the termination hearing on December 19, 2023.
> 2. That the undersigned joins in the recommendation of [the department] for termination.
> 3. That the undersigned believes that termination is in the child's best interest.

The State does not contest that the court considered the GAL report in making its termination decision.[10]  Rather, the State maintains that the GAL complied with section 232.2(25)(b)(8): "The December report simply reiterated the position from the September report."  The State adds that "while a written report to show compliance with the subsection is required, the code section is silent on when it is required to be filed."  The State suggests that guardians ad litem might want to wait until hearing all the testimony before formulating their recommendation.

The State construes the GAL's duties too narrowly.  It is not enough for the GAL to passively take in the evidence at the termination hearing and later share a recommendation with the court.  The statute directs the GAL to submit a written report "for each court hearing."  *Id.* § 232.2(25)(b)(8).  The report is to "detail compliance" with the GAL's information-gathering duties in section 232.2(25)(b), paragraphs (1) through (5).  Those duties "include conducting interviews, making home visits, attending hearings, and conducting fact-finding to enable the GAL to represent the child's best interests."  *See State v. Lopez*, 872 N.W.2d 159, 176 (Iowa 2015) (explaining the duties of a GAL appointed to a juvenile crime victim by citing Iowa Code chapter 232 provisions).  The GAL must submit the report to the court *and* to each of the parties.  Iowa Code § 232.2(25)(b)(8).

---

[10] The State challenges error preservation.  But the record shows that the parents' attorneys both discussed the GAL's responsibilities at the September 2023 hearing and the court found: "It is the guardian ad litem's statutory duty to file a report before hearing and no report has been filed."  And the father pointed out in his written closing argument that the September report does not adhere to reporting requirements and no GAL report was filed before the termination hearing.  He also criticized the GAL for not updating the court on any information about her contact with the child.

The GAL's barebones reports did not meet the statutory requirements. Their content did not show that the GAL fulfilled their investigative role. The reports did not mention interviews or visits with the child or placement or other fact-finding beyond "speaking with" the department and reviewing reports. As for the timing, we interpret the phrase "for each court hearing" as requiring the GAL to submit a report to the court and other parties *before* each hearing, unless the court makes a good cause finding circumscribing that duty. *See N.W.*, 2023 WL 1813629, at *2 (finding good cause to waive written report and allow GAL to give oral report at the hearing because she injured her wrist). If a statute contains ambiguity, we give the language "a sensible, practical, workable, and logical construction." *Taft v. Iowa Dist. Ct. ex rel. Linn Cnty.*, 828 N.W.2d 309, 317 (Iowa 2013). And in this context, "for" each hearing most logically means "in preparation for or anticipation of" that hearing. *See Jennings v. Rodriguez*, 583 U.S. 281, 301 (2018) (citing 6 Oxford English Dictionary 24 (2d ed. 1989)).

Because the GAL did not meet the statutory requirements, we agree with Bradlee that the juvenile court was remiss in relying on the GAL's position that termination is in A.D.'s best interests. The district court also was remiss in relying on the case manager's recommendation considering her limited contact with Bradlee and A.D., her unwillingness to consider the negative results on the HairStat test, and her reluctance to move beyond supervised visitation despite Bradlee's progress.

"Termination is a drastic, final step which improvidently employed can be fraught with danger. Termination must only occur where more harm is likely to befall the child by staying with his or her parents than by being permanently

separated from them." *In re H.H.*, 528 N.W.2d 675, 677 (Iowa Ct. App. 1995). We cannot yet say A.D. faces greater harm from delaying permanency than being permanently separated from her father. A.D. is comfortable in her relative placement and enjoys visits with her father and stepmother. Nothing in our record suggests that continuing this arrangement for another six months would harm the two-year-old in any way. But more time would allow Bradlee to show that he is not using illicit drugs and is making serious efforts to address his history of substance use.

Granted, "[t]his father is not perfect, but the law does not require perfection." *See In re M.S.*, 889 N.W.2d 675, 686 (Iowa Ct. App. 2016). Bradlee has struggled with his mental health and substance use. But this record shows that he has the potential to be a capable father. He helped the grandmother care for A.D. as an infant and developed a bond with her. Early in the case, service providers documented Bradlee's "positive parenting skills." Bradlee has continued regular visitation with A.D. in her new relative placement, increasing those interactions to twice weekly. And Bradlee attends A.D.'s doctor's appointments. In June 2023, the service provider testified that Bradlee had become a more engaged parent during his visits with A.D. He also appears to have stabilized his mental health. Under these circumstances, we conclude Bradlee should have been afforded another six months to attempt reunification.

Our decision to continue placement is also influenced by Bradlee's reasonable-efforts argument. At the September 2023 hearing, Bradlee's counsel asked the court for hair testing to confirm or discredit the sweat patch tests:

> If they want to continue testing the method that they're using, then we would ask that they do further testing upon completing those initial tests. We thought a HairStat would be just kind of a straightforward method to address whether there's been any use in the past ninety days, which is why we recommended it.

At the end of the hearing, the court granted Bradlee's request:

> I will order a HairStat test be completed. I'm not saying that that's going to be a final resolution of the issues that come before the court but, you know, I guess we can address that issue through the HairStat testing. But I guess my expectation would be, Ms. Hernandez, that you continue to do all the tests, whether it's sweat, urine, HairStat, until we come back to court.

Yet, as Bradlee notes on appeal, the department "failed to perform any further testing on [his] positive tests, which precluded the court and parties from obtaining a more accurate picture of the situation."[11] While the department did perform a HairStat test the day after the September hearing, contrary to the juvenile court's order, all the remaining tests after that point were sweat patches. The juvenile court focused its termination decision on the fact that Bradlee continued to test positive for methamphetamine but denied using that drug, blaming the positive tests on "his psychotropic medications." Given the questions raised by Bradlee

---

[11] The State contends that Bradlee did not preserve his reasonable-efforts claim because he did not address the department's lack of compliance at the December 2023 hearing. But Bradlee's attorney extensively cross-examined case manager Hernandez about drug testing and the information from Bradlee's psychiatric provider about the danger of false positives from his medication. Bradlee also testified that the department did not offer him further testing. In written closing arguments, Bradlee's counsel stated: "Although Bradlee's psychiatric provider indicated that further testing should clear up any question about whether results for meth and cocaine were false positives (*See Father's Exhibit I),* the Department has never requested further testing." We find error was preserved. It is enough for the parent to identify additional services that are needed and for the court to order those services be provided. *See* Iowa Code § 232.99(3); *In re J.L.*, 868 N.W.2d 462, 467 (Iowa Ct. App. 2015) (granting relief on reasonable-efforts claim when parent raised department's refusal to furnish a sign language interpreter).

concerning the possibility of false positive drug tests caused by his prescription medications, additional testing would provide more information to ensure the accuracy of the sweat patch test results.

**REVERSED AND REMANDED.**

Badding, J., concurs; Buller, J., partially dissents.

**BULLER, Judge** (concurring in part, dissenting in part).

I concur in the judgment to give the father additional time based on the peculiar record in this appeal. But I dissent from the majority's analysis concerning the guardian ad litem (GAL) reports on the issues of error-preservation and remedy.

I would find no error was preserved. The father did nothing seeking corrective action below—he did not move for a continuance, move to compel the GAL to file a report, ask the court to hold the GAL in contempt, or seek to exclude the GAL's recommendation from the juvenile court's consideration. *Cf. In re N.W.*, No. 22-1946, 2023 WL 1813629, at *2 (Iowa Ct. App. Feb. 8, 2023) (parent sought continuance when GAL did not timely file report). I take issue with the majority's footnote 12, which contends error was preserved because the attorneys "discussed the GAL's responsibilities" and the juvenile court noted no report was filed. That's true as far as it goes. But here is what the father's written closing argument actually said, contained in its entirety in a footnote with no substantive argument above the line:

> The last GAL report was filed on September 11, 2023. That report does not adhere to the reporting requirements of [section] 232.2(22)(b). No GAL report was filed prior to the hearing that took place on 12/19/23. The GAL did not make a recommendation at the hearing or update the court with information about her contact with the child or any of the other information statutorily required under [section] 232.2(22)(b).

This is not an objection. Nor is it a request for any remedy. A juvenile judge reading this footnote would have no reason to think the parent was asking the court to do anything. And musings about the law do not preserve error, for they do not seek any action by the court. *See, e.g., State v. Krogmann*, 804 N.W.2d 518, 524

(Iowa 2011) (finding error not preserved when a filing "did not request the district court to take action"). In similar circumstances, this court concluded error was not preserved when the department did not fulfill its duty to timely file reports and the parent did not "articulate a remedy for the omission, or state how he was prejudiced." *In re J.V.*, No. 21-0806, 2021 WL 4891063, at *3 (Iowa Ct. App. Oct. 20, 2021) (internal quotation marks omitted). I would follow *J.V.*'s reasoning to conclude error was not preserved here, rather than reach out to decide and address an arguable issue of first impression interpreting the scope of duties under the revised statute.

It is a little unclear to me whether the majority considers the GAL's failure to fulfill its duties as an independent basis for reversal. To the extent future litigants might construe the majority finding "the juvenile court was remiss in relying on the GAL's position" suggests any shortcoming by a GAL carries exclusion of the recommendation and reversal as a remedy, I specifically reject that interpretation of the statute. We are only empowered to reverse based on errors that are prejudicial, *see* Iowa Code §§ 619.16, 624.15 (2023), and I see no prejudice to the parent here from the incomplete report.

I also worry about consequences beyond this case. First and foremost, reversing juvenile proceedings without finding prejudicial error undermines the stability we intend these proceedings to offer, with a consequence of further traumatizing children caught in the system. Second, GALs are court-appointed attorneys, for which we have a shortage across this state, and I doubt a ticky-tack approach to their duties will result in more attorneys willing to do that work at the paltry hourly rate. And third, I doubt strict compliance and automatic reversible

error carries out the General Assembly's intent in modifying the list of GAL duties in 2022. *See* 2022 Iowa Acts ch. 1098, §§ 6–9. For example, the revised statute includes as one of the "duties" that the GAL submit a written report "detailing compliance with this subsection." Iowa Code § 232.2(25)(b)(4), (8). The statute does not explain the extent of detail the written report must include. Must there be dates of every interview conducted, which potentially includes every teacher, nurse, and dentist that has contact with the child? *See id.* § 232.2(25)(b)(1). If the report only indicates an interview took place without summarizing the content of the conversation, does it fail to "detail[ ] compliance" with the statute? These unanswered questions give me pause.

In a broad sense, well-done GAL reports give the court a window into the child's world and aid the court in making critical decisions that alter the course of a family's lives. The statute appears designed to promote useful reporting, and the reports in this case fall short of that goal. But I do not think the General Assembly intended that we reverse every juvenile proceeding where the GAL has not exhaustively reported their actions to an unspecified degree. Because I would find error was not preserved and I believe the majority's remedy suggestion carries negative consequences contrary to legislative intent, I dissent in part.